**PANTROPIC POWER PRODUCTS, INC., Plaintiffs,**

v.

**FIREMAN'S FUND INSURANCE COMPANY, Defendant.**

**No. 00–1719–CIV–MOORE.**

United States District Court,
S.D. Florida,
Miami Division.

April 26, 2001.

John W. McLuskey, McLuskey Mc-Donald & Payne, Lauri Beth Waldman–Ross, Miami, FL, for Plaintiff.

Andrew Edward Grigsby, Jr., Hugh J. Connolly, Esq., Hinshay W. Culbertson, Miami, FL, for Defendant.

### ORDER

MOORE, District Judge.

THIS CAUSE came before the Court upon Defendant's Motion for Summary Final Judgment (DE # 21), and Plaintiff Pantropic's Cross–Motion for Summary Judgment (DE # 33).[1] Upon consider-

---

1. The individual Plaintiffs, Miguel Diaz, Jeff Dana, and John Willis, seem to have aban- doned the suit. They are not named in the Amended Complaint, nor have they partici-

ation of the Motions, responses, and the pertinent portions of the record, the following Order is entered.

## BACKGROUND

Plaintiff brings this action for declaratory relief against its insurance provider. Plaintiff purchased an Employment–Related Practices Liability Insurance Policy ("EPLI") from Fireman's Fund on June 24, 1998.[2] The policy provided for the payment of damages and the defense of claims arising from wrongful employment practices on or after the retroactive date of July 1, 1993. This was a "claims-made" policy, which limited coverage to claims first made against the insured during the policy period and reported to the insurer "as soon as practicable after the claim is made (but in no event more than 60 days following the end of the policy period)."[3] Pursuant to the policy terms, a claim is "first made" against the insured when "the insured receives written notice from the claimant … alleging that the insured has committed a wrongful employment practice;" claims arising from "the same wrongful employment practice or series of similar or related wrongful employment practices" are deemed to be a single claim for the purpose of notice provision.[4] The "policy period" is defined as the period the "policy is in effect from the inception date showing the Declarations."[5] The First Policy had an inception date of July 1, 1998; Plaintiff renewed its coverage and entered a second policy, which had an inception date of July 1, 1999.

On November 12, 1998, David Flores, an employee of Pantropic, filed an administrative charge of sexual harassment against Pantropic. Following an investigation, the Florida Commission on Human Rights issued a Dismissal and Notice of Rights, and Flores filed a civil complaint against Pantropic on September 3, 1999. The Complaint accused Pantropic of retaliation and negligent retention in addition to the prior allegations of sexual harassment raised in his administrative charge. Pantropic reported the Flores suit to Fireman's Fund on September 17, 1999. After an investigation of the claim, Defendant denied coverage based on the insured's failure to report the claim within sixty days of the expiration of the policy period in which the claim was first made. The present declaratory action ensued. Plaintiff asserts entitlment to coverage and a defense to the Flores suit, and avers that Defendant was not prejudiced by untimely notice of the claim. Plaintiff further seeks an award of attorney's fees.

■■ The parties agree that the dispute may be resolved as a matter of law based on the record;[6] accordingly, each side has moved for summary judgment. Defendant asserts that the Flores claim was first made against the insured on November 12, 1998, when Flores filed his administrative charge, and as such, the claim would only

pated in the action since the filing of the original complaint in state court.

2. The facts herein are undisputed and are derived from the Joint Pretrial Stipulation filed on April 4, 2001.

3. Employment Related Practices Liability Insurance, Claims Made Basis—Defense Within Limits, para. I(C) ("What We Cover: When Claims Are Covered") (hereinafter "First Policy").

4. *Id.* at I(D).

5. *Id.* at VIII(E) (Definitions).

6. The parties reserve for trial the question of whether the costs and fees incurred by Pantropic in the defense of the Flores suit were reasonable, should the Court declare Defendant liable for such expenditures.

be covered if it was reported to the insurer within sixty days of the end of the policy period. Because Plaintiff first reported the claim on September 17, 1999—sixteen days too late—the claim is not covered. Plaintiff contends that, because two of the claims, for retaliation and negligent retention, were first made in September of 1999 and promptly reported within the same policy period, these claims are covered; accordingly, Defendant must at least provide a defense for the entire Complaint.[7] Plaintiff further avers that Defendant was not prejudiced by the untimely notice of the complaint; impliedly, Plaintiff concludes therefrom that Fireman's Fund was obligated to defend against the Flores suit.

## DISCUSSION

### Claims–Made Policies

▮ The Court must construe the disputed policies in a manner consistent with the purpose of claims-made policies and which preserves their primary benefits to the parties. *See, e.g., City of Harrisburg v. International Surplus Lines, Ins. Co.,* 596 F.Supp. 954, 961 (M.D.Pa.1984). With a claims-made insurance policy, the insurer undertakes a more limited risk than an insurer who issues an occurrences policy; insurers typically charge higher premiums for occurrence policies to compensate for their exposure to indefinite future liability. *See, e.g., National Union Fire Ins. Co. of Pittsburgh v. Baker & McKenzie,* 997 F.2d 305, 306 (7th Cir.1993). Occurrence policies cover acts which occur in the life of the policy, irrespective of when the claims

are asserted against the insured. In comparison, a claims-made policy only protects the insured against claims *made and reported* during the policy period. *See St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 565 n. 3, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978). In essence, coverage is "triggered" by the insured's discovery of a claim and the provision of notice to the insurer within the policy term. *See United States Fire Ins. Co. v. Fleekop,* 682 So.2d 620, 622 (Fla.Dist.Ct.App.1996). "[I]f the claim is not reported during the policy period, no liability attaches." *Gulf Ins. Co. v. Dolan, Fertig & Curtis,* 433 So.2d 512, 515 (Fla.1983) (*cited in United Nat'l Ins. Co. v. Jacobs,* 754 F.Supp. 865, 868–69 (M.D.Fla.1990)).

▮ Plaintiff seeks a declaration that Defendant was not prejudiced by the late notice, if in fact notice was untimely. Plaintiff thus advances applicability of the "notice-prejudice" rule to this claims-made policy, and avers that it would be impossible for this Court to "guess" how the Florida Supreme Court would rule on this issue. However, the supreme court has rejected applicability of the rule to claims-made policies, observing that any extension of the reporting period would "negate[ ] the inherent difference between the two contract types."[8] *See Gulf Ins. Co.,* 433 So.2d at 515. Florida law thus clearly counsels that the Court may not impose such an extension, as it would in effect expand the scope of coverage, and permit the insured to enjoy a benefit for which he has not given consideration. The Court's

---

**7.** Where part of a complaint falls within the scope of the insured's coverage, and part does not, Florida law requires the insurer to defend against the entire complaint. *See Tire Kingdom, Inc. v. First Southern Ins. Co.,* 573 So.2d 885, 887 (Fla.Dist.Ct.App.1990).

**8.** *Accord Paint Shuttle, Inc. v. Continental Casualty Co.,* 733 N.E.2d 513, 522 (Ind.Ct.App.

2000) ("The notice provision of a 'claims made' policy is not simply the part of the insured's duty to cooperate, it defines the limits of the insurer's obligation.... If the insured does not give notice within the contractually required time period, *there is simply no coverage under the policy*.").

present inquiry is thus limited to whether the first policy period ended before Pantropic reported the claim on September 17, 1999; or whether, as Plaintiff avers, the policy period was continued by Plaintiff's renewal of coverage under the Second Policy.

■ The parties dispute whether the first and second policies were discrete and separate contracts, or whether the renewal policy continued the original coverage as one policy.[9] Plaintiff contends that "many courts regard the renewed or renewal contract as though it were merely a continuation or extension of the original contract."[10] Plaintiff did not provide support or examples of such courts; regardless, Plaintiff's assertion does not bear on the ultimate question of whether renewal extended the Policy Period and thus expanded the scope of coverage. The contract clearly contemplates that each policy runs for a separate and finite period, running from the date of inception to the date of expiration. This is evidenced on the declaration page, which identifies an inception date of July 1, 1998, and an expiration date one year later on July 1, 1999. Further, coverage limits are defined with respect to *each* Policy Period: "The limits apply separately to each consecutive annual **policy period**."[11] Plaintiff's argument is directly contradicted by the unambiguous contractual language.

Plaintiff's characterization of the second policy as a renewal is of no legal import. The Court surmises that Plaintiff raises this argument to support its contention that Pantropic bargained for and received continuous, uninterrupted coverage.[12] Plaintiff urges the Court not to interpret the policy in a manner that permits gaps in coverage, as it was clearly Pantropic's intention to maintain continuous coverage throughout the two policy periods. Unmistakably, the two policies did provide for continuous coverage, so that claims raised between July 1, 1998 and July 1, 2000, would be covered, provided that Pantropic timely notified the carrier of the claim. The policy unambiguously limits the insurer's exposure to those claims reported "as soon as practicable ... but in no event more than 60 days following the end of the policy period." The Flores claim did not fall into cracks between the two policies, nor was the coverage illusory. Had Pantropic reported the claim during the policy period *in which it was asserted* against Pantropic, Defendant would have been obligated to defend the claim.

As a last resort, Plaintiff invokes the specter of ambiguity, alleging that the policy is unclear as to when the insured must purchase an extended reporting period to maintain coverage. Plaintiff argues that an ambiguity is created in the policy by its inclusion of "nonrenewal" as one of the circumstances requiring the purchase of an extended reporting period to maintain coverage, where the contract is silent on the effect of renewal on the insured's maintenance of coverage. Plaintiff draws support from *Helberg v. National Union Fire Insurance Co.*, 102 Ohio App.3d 679, 657

---

9. Plaintiff contends, without further explanation or legal support, that this question is the "crux of the legal dispute" presented herein.

10. Pantropic's Response & Memorandum of Law in Opposition to Fireman's Fund Motion for Summary Judgment, at 16.

11. Policy, at IV(A) (bold in original); Declaration Page, Item 3.

12. Plaintiff implies that it paid a specific renewal premium to ensure continuous coverage, thereby suggesting that Pantropic gave additional consideration to alter a term of the contract—the policy period—from one year to two. However, Luis Botas, Pantropic's president, testified that he paid the usual premium upon renewal.

N.E.2d 832 (1995), wherein the court found conflicting policy language, which created an ambiguity that was accordingly construed in favor of the insured. The policy contained language under the Exclusion Section contemplating a single policy period, which the insured could continuously renew. The effect of that section was to exclude coverage of any claim about which the insured knew before the effective date of the first policy issued. The *Helberg* court could not reconcile this section with the notice provision of the contract, which limited coverage to claims made and reported during the policy period. *See id.* at 834. No such conflict exists in the policy under consideration, and the *Helberg* holding is inapplicable to the present dispute.[13] Plaintiff's attempt to create ambiguity where none exists is unavailing.

*Retaliation and Negligent Retention*

█ Having determined that the claims asserted by Flores in his administrative charge were not covered by the First Policy, the Court next considers whether the two additional allegations asserted in the civil suit were covered by the renewal Policy; if so, Defendant was obligated to defend Plaintiff against not only these two claims, but the entire suit. Plaintiff asserts that the two additional claims were first made on September 3, 1999, upon the filing of Flores's civil compliant, and timely reported days later. Plaintiff further argues that the additional claims by their definition could not have come into existence until after Flores filed the administrative charge; thus, Plaintiff concludes, the additional claims could not have been previously asserted against Pantropic. Defendant argues that the claims arose from the same wrongful practice, or series or related wrongful employment practice, and are accordingly deemed to be a single claim, which was first made when Flores filed his administrative charge. Plaintiff devotes none of its discussion to the issue of whether the wrongful employment practices alleged in the additional claims are *related* to those employment practices previously alleged, such that the aggregate of claims "will be *deemed* to be a single claim" as proscribed in the policy.

The relatedness of the claims must be considered in the context of the type of insurance at issue. Plaintiff characterizes Employment Related Practices Liability Insurance Policies ("EPLI") as "a recent creation of the insurance industry designed to meet the shortcomings in standard liability policies for employment practice claims such as, *inter alia*, workplace discrimination, wrongful termination, and sexual harassment claims."[14] The Court is further guided by the import placed on prompt notice of potential claims, which allows the insurer to anticipate the extent of its exposure and plan for the defense of such claims. The prudent insurer, when setting aside resources for the defense of a wrongful employment practice suit, must anticipate that a claimant will raise all possible claims. In this context, relatedness is broadly construed, such that claims that are causally connected, or which arise from similar factual circumstances, are "related" for purposes of the provision of notice. *See Paradigm Ins. Co. v. P&C Ins. Sys., Inc.*, 747 So.2d 1040, 1042 (Dist. Ct.App.Fla.2000) (drawing support from analyses applied by various courts in determining that two separate acts of negligence were "related" for purpose of notice provision). The factual circumstances giving rise to the Flores allegations share

---

13. The Court expresses no opinion as to whether the Florida courts would adopt the holding of this Ohio appellate decision.

14. Pantropic's Cross–Motion for Summary Judgment, at 1.

temporal proximity and involve the same individuals. Also, the alleged acts of retaliation and negligence occurred not in a vacuum but as a consequence of the prior acts of harassment. The Court concludes that the factual circumstances alleged are sufficiently related for purposes of the notice provision of the policy.

Nor is it obvious, as Plaintiff insists, that the additional claims did not come into existence until after Flores filed his administrative charge. Plaintiff argues that, because these claims stem from the filing of the administrative charge, Defendant has demanded the impossible by expecting notice of this claim before it even happened. The Flores Complaint clearly alleges that he made repeated *internal* complaints to his employer before seeking agency intervention. In his administrative charge, Flores alleged that he had been subject to harassment for almost seven months preceding his complaint; that he "objected to the harassment in excess of twenty times;" and that the employer failed to take corrective action. Additionally, the Complaint alleges that "Flores and others complained about Diaz, Dana and Willis' sexual harassment of him to managers and to the human resources department, *and* Flores filed a charge of discrimination with EEOC alleging that he was harassed." [15] Flores alleges that Pantropic retaliated against him not only for filing the administrative charge but also for making an internal complaint. An employee's participation in his employer's internal investigation is protected activity under the opposition clause of Title VII, *see EEOC v. Total Sys. Serv., Inc.,* 221 F.3d 1171, 1174 (11th Cir.2000); accordingly, Flores's internal complaints, prior to his filing of the EEOC charge, could form the basis of his retaliation claim.

## CONCLUSION

Based on the foregoing, it is hereby ORDERED AND ADJUDGED that Defendant's Motion for Final Summary Judgment be, and the same is, hereby GRANTED. It is further ORDERED that Plaintiff's Cross–Motion for Summary Judgment is DENIED.

This case is CLOSED. All pending Motions are DENIED as MOOT.

---

15. Flores Complaint para. 49 (Plaintiff's ap-   pendix 45) (emphasis added).